**GRANITE & QUARTZITE CENTRE INCORPORATED, Plaintiff,**

v.

**M/S VIRMA, her engines, boilers, tackle and apparel, et al., Defendants.**

**Civ. A. No. 3221.**

United States District Court, S. D. Georgia, Savannah Division.

April 22, 1974.

Edward T. Brennan, Richard A. Rominger, Adams, Adams, Brennan & Gardner, Savannah, Ga., for plaintiff.

Walter C. Hartridge, II, Edwin D. Robb, Jr., Bouhan, Williams & Levy, Savannah, Ga., for defendants.

ORDER ON MOTION TO DISMISS FOR WANT OF JURISDICTION AND TO QUASH ENTRY OF SERVICE

LAWRENCE, Chief Judge.

In this admiralty case Leonard J. Buck & Co., Inc. has filed a motion to

dismiss on the ground that this Court is without jurisdiction. The defendant has also moved to quash the return of service upon the ground that it is a foreign corporation and is not subject to service of process under the Georgia Long-Arm statute in that it did not transact business within the State of Georgia.

Leonard J. Buck & Co., Inc. is a New Jersey corporation and was the voyage charterer of the merchant vessel "Virma" which called at Savannah in November, 1973, to discharge cargo at the State Port. The point at issue is whether this single, isolated visit of the ship under voyage charter by defendant constitutes the transacting of business in this State by Buck & Co. within the meaning of the provision of the Long-Arm statute which states: "A court of this State may exercise personal jurisdiction over any nonresident . . . if in person or through an agent, he: (a) Transacts any business within this State. . . ." Ga.Code Ann. § 24-113.1.

The complaint alleges that the plaintiff, Granite & Quartzite Centre, Inc. through Buck & Co. booked space on the "Virma" for 2,994 metric tons of granite on a voyage from Portugese East Africa to Savannah. When that vessel called at the Port of Lourenco Marques in September, 1973, the cargo was ready for shipment. It is alleged that as a result of the breach of the contract of affreightment between plaintiff and Leonard J. Buck & Co. there was space for only 2,028 metric tons of granite blocks with the result that 960 tons were left at the dock when the vessel sailed from Africa. Plaintiff sues for the loss resulting from having to ship the remaining granite at a higher rate and because of cancellation of orders booked in anticipation of the delivery of the entire purchase.

Granite and Quartzite Centre, Inc. maintains a sales office and place of business at Tucker, Georgia. It is engaged in the business of buying granite in Africa, Uruguay, Scandinavia and other places and selling the "rough block" in the United States. After making arrangements for the purchase of granite in Portugese East Africa the Vice President of the plaintiff corporation, Peter T. de Kok, looked for space aboard an available vessel for transportation to Savannah. In the past he had obtained cargo space on various vessels through Buck & Co.

On the occasion in question Mr. de Kok telephoned Andrew J. Killelea, Vice President of Buck & Co., and requested him to find a vessel sailing from Africa on an approximate date and having heavy lift gear. After some delay and other calls, plaintiff was offered the "Virma" for shipping the granite to Savannah. During the past year and a half or two years there had been five or six such transactions between plaintiff and Buck & Co. but this was the first occasion in which a vessel entering the United States through the port of Savannah was involved. While the arrangement with Mr. Killelea was by word of mouth the transaction was confirmed by what is called a "Fixture Note". The instrument in question recited that "In accordance with our telephone conversations, we are pleased to confirm having booked for you" certain "OCEAN FREIGHT SPACE" on the "Virma" for transportation of 2,994 metric tons of granite from Lourenco Marques, P.E.A. to the "discharging port", Savannah, at a stipulated freight rate. The Fixture Note represents an agreement that the issuer has booked a vessel and has reserved space aboard for the cargo transported. The bills of lading do not appear in the record. The granite is the property of plaintiff at F.O.B.

Mr. Killelea testified that the primary business of Leonard J. Buck & Co. is that of dealing in ore, metals and alloys. "We charter ships to carry our cargos. We also subcharter space on ships and carry other cargo to fill them out." He said that Buck & Co. acted as agent for

the charterers. Buck & Co. had never had business dealings in Georgia and had not previously booked cargo for Granite & Quartzite Centre or anyone else at a port of this State. It has no office, agent or place of business in Georgia. The plaintiff has, as stated, a sales office at Tucker, Georgia, through which the granite is sold and then re-shipped from the port of entry.

Stevens Shipping & Terminal Company of Savannah acted as agent for the ship. It was recommended to Buck & Co. by Mr. de Kok. In September, 1973, defendant wrote to Stevens to confirm its appointment "to act as charterers' agent for subject vessel calling at your port, in accordance with the terms and conditions of the governing charter party". The "Virma" was under time charter to Clipper Shipping Company, Ltd. and was sub-chartered by such "disponent-owner" to Buck & Co. as voyage charterer. The master and the crew were employed by the owners. Defendant gave no orders to the vessel, communicating its wishes through the owners.

According to Mr. Killelea, the agent was supposed to "protect the charterer in his affairs and also, if required to take care of anything that needs to be done with the vessel, handle the vessel, in other words, on behalf of the charterer." Prior to the arrival of the "Virma" on November 9, 1973, Stevens arranged for the services of a bar pilot and tug boats. It attended to berthing space, handled the stevedoring work for Granite & Quartzite Centre and performed duties normal to those of a ship's agent. Presumably, supplies were taken aboard at Savannah. After discharging cargo at Garden City Terminal the "Virma" left port.

Contending that these activities satisfy the Long-Arm statute as to transacting business in Georgia, plaintiff relies on Mitsubishi Shoji Kaisha Ltd. v. MS GALINI et al., 323 F.Supp. 79, 1972 A.M.C. 1298 (S.D., Tex.), 1971; International Trading Company, Inc. v. Trans-marine Contract Carriers, Inc., 1971 A.M.C. 154 (State Court of Chatham County, 1970) and Kanematsu-Gosho (USA) Inc. v. SS "ATLANTIC SUN" et al., Civil Action No. 71–1108, U.S.D.C., S.C., Charleston Division, 1972.

In Mitsubishi Shoji Kaisha Ltd. v. MS GALINI, et al., *supra*, the Court held that there was sufficient contact with the State of Texas to support Long-Arm service where the ship was ordered to Brownsville to load grain for Japan. While the sole connection of the ship-owner and ship with Texas was the loading of the cargo, the "gravity of the single contact . . . sufficiently warrants a finding that there is jurisdiction". Similarly, in International Trading Company, Inc. v. Transmarine Contract Carriers, Inc., 1971 A.M.C. 154 the Court concluded that service under the Long-Arm statute was sufficient where the vessel made a fifteen-day stop at Savannah at which, pursuant to a contract with the plaintiff, she loaded a cargo for transportation to Rotterdam. "[T]he single call by the tramp steamer in the port of Savannah constituted doing business within the meaning" of the Georgia statute, according to the State Court of Chatham County, Georgia.

The federal District Court of South Carolina has held that the owner of a vessel was doing business in South Carolina and was therefore subject to substituted service although only a single trip to the port of Charleston was involved. Kenematso-Gosho (USA) Inc. v. SS "ATLANTIC SUN", *supra*. Among the decisions there cited is State Highway & Public Works Commission v. Diamond S.S. Transportation Corporation, 225 N.C. 198, 34 S.E.2d 78 in which the Supreme Court of North Carolina said that any other construction of the statute would make it possible for the vessel to "ply its trade in every port from Seattle to Bangor and back again, leaving a trail of obligations in its wake, and never 'do business' in any state, or become subject to any statute designed to bring

it into court upon that basis".[1] See also Gkiafis v. SS Yiosonas, 342 F.2d 546, 555–556 where the Court of Appeals for the Fourth Circuit stated that "a finding of regular contacts with a forum state is not an indispensable predicate to the assertion of jurisdiction. The regularity test applies only when the commercial contact is insignificant in itself and the cause of the action did not arise therefrom".

The Georgia Long-Arm statute requires that "the cause of action arise from the act of transacting the business". Castleberry v. Gold Agency, Inc., 124 Ga.App. 694, 697, 185 S.E.2d 557, 560; Coe & Payne Company v. Wood-Mosaic Corporation et al., 125 Ga.App. 845, 189 S.E.2d 459 (reversed for other reasons, 230 Ga. 58, 195 S.E.2d 399). If the above-described activities of defendant in connection with the call of the "Virma" at Savannah constituted "transacting any business" in this State, the cause of action sued on plainly arose out of the transaction of such business. The breach of the contract of affreightment did not occur until the vessel discharged the cargo in Georgia and defendant failed to deliver *all* of the granite contracted to be shipped aboard the "Virma" to Savannah.

Since service in the present case was effectuated under a State statute (Rule 4(d)(7), F.R.Civ.P.) the law must be applied by this Court as the appellate courts of Georgia would presumably construe it under a similar factual situation. They have not had occasion do so so and I must therefore predict how they would likely decide this case.

Given the same facts, I conclude that the Supreme Court or the Court of Appeals of Georgia would hold that the defendant's activities amounted to transacting business in Georgia within the intendment of the statute. The business carried on by Buck & Co. included transportation of granite by chartered vessels to the United States. Defendant contracted to furnish cargo space on board a ship subchartered by it and to deliver such shipment at Savannah. When the "Virma" put into this port and discharged cargo, Buck & Co. was transacting its ordinary business and was doing so in Georgia. What if it was the first and only time defendant brought a ship into this State? This single contact with Georgia was a substantial one. The affreightment contract required performance at Savannah of a fundamental and indispensable element of the business undertaking. The breach as to delivery of cargo occurred and the cause of action accrued when the vessel discharged at Savannah and failed to deliver all the granite agreed to be transported.[2]

---

1. In addition to the cases cited, attention is called to the rhymed opinion in Mackensworth v. American Trading Transportation Co., 367 F.Supp. 373 (E.D., Pa.), 1973, in which Judge Becker held:

   "Ship's single visit to Pennsylvania port,
   subjects owner to that state's federal court,
   for Pennsylvania's amended longarm acts give court personal jurisdiction,
   since under these facts
   New York Shipping company,
   while unloading its stores,
   was 'doing business' upon Pennsylvania shores."

2. Defendant contends that the cause of action arose when the full cargo was not placed aboard the "Virma" in Africa. The duty of a carrier includes delivery of the goods to the party entitled to receive them and transportation is not completed until the shipment arrives at destination and is there delivered. 70 Am.Jur.2d Shipping § 479; 13 Am.Jur.2d Carriers § 405; Danciger v. Cooley, 248 U.S. 319, at 327, 39 S.Ct. 119, 63 L.Ed. 266. "If the shipowner, contracting to load a full cargo, only loads and carries part of it . . . he will . . . only be entitled to freight *pro rata* on the quantity delivered; and the freighter can counter-claim for short delivery. . . . ." Scrutton on Charter Parties and Bills of Lading (1939), 411–412. In computing damages for non-delivery by vessel the period commences with the time the cargo ordinarily would have been unloaded at destination in this country. See Jackson & Co., Inc. v. Lorentzen et al., 83 F.Supp. 486, 491–492 (S.D., N.Y.).

As to existence of "minimum contacts" with the state so as not to "offend traditional notions of fair play and substantial justice" (International Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95) I do not perceive the difference between Leonard J. Buck & Co. transporting cargo to Georgia on only one occasion and the case of a non-resident insurer issuing and sending through the mails on a single occasion a policy on the life of a resident of the forum state in which the insurance company had no agents. *Cf.* McGee v. International Life Insurance Co., 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed. 2d 223. I fail to understand how the statute can mean one thing as applied to a vessel's first call in Georgia and something entirely different after a third, fourth or fifth voyage to the ports of this State. The Long-Arm statute says nothing about regular, continuous, systematic transaction of business. Both literally and by fair interpretation, the legislation confers jurisdiction over Buck & Co. and permits service of process. In Davis Metals, Inc. v. Allen, 230 Ga. 623, 625, 198 S.E.2d 285, 287, it was said:

"Under our Long Arm Statute jurisdiction over a nonresident exists on the basis of transacting business in this state if the nonresident has purposefully done some act or consummated some transaction in this state, if the cause of action arises from or is connected with such act or transaction, and if the exercise of jurisdiction by the courts of this state does not offend traditional fairness and substantial justice."

The Long-Arm statute "contemplates that jurisdiction shall be exercised over non-resident parties to the maximum extent permitted by procedural due process. . . ." *Wood-Mosaic Corporation, supra,* 230 Ga. 60, 198 S.E.2d 285. That case presented a products liability situation in which the alleged negligent act of the defendant was committed outside Georgia with the damage occurring within this State. The Supreme Court held that the language of the statute as it read at the time of the injury permitted jurisdiction to be predicated on the shipment of defective goods by the defendant into Georgia.[3]

Another important 1973 decision by the Supreme Court of Georgia as to Long-Arm jurisdiction is J. C. Penney Company v. Malouf Company et al., 230 Ga. 140, 196 S.E.2d 145. There the plaintiff was injured when a maternity smock alleged to be highly inflammable caught fire. She sued the retailer which, in turn, impleaded the manufacturer on grounds of breach of warranty and express indemnity. The latter's only contact with Georgia was the shipment of the merchandise to Penney and the sales and warranty agreements referred to. Service on the third party defendant was perfected under the Long-Arm statute. In reversing the Court of Appeals, the Georgia Supreme Court held that the shipment into this State satisfied the requirements of due process as to minimum contacts; that Malouf had placed the merchandise in the stream of commerce for resale at retail to Georgia citizens, and that doing so pursuant to the warranty-indemnity contract amounted to "transacting any business" in Georgia under subsection (a) of the Long-Arm statute.[4]

In the review of recent Georgia decisions on that subject referred to in footnote 4 the authors state that under the

---

3. The Court adopted the Illinois Rule as illustrated by Gray v. American Radiator & Standard Sanitary Corp., 22 Ill.2d 432, 176 N.E.2d 761.

4. For a discussion of *Malouf* and *Wood-Mosaic Corporation,* see survey of 1973 decisions in connection with trial practice and procedure in Georgia by J. Ralph Beaird and C. Ronald Ellington, 25 Mercer Law Review (Winter, 1974), 265–275.

"transactions of business" theory of Long-Arm jurisdiction more than a simple contract has usually been required to sustain jurisdiction. They point out that "transaction of business may require more contacts than the single contact sufficient for jurisdiction if that contact leads to tortious injury within the state". See 25 Mercer Law Review, 273. "The bare bones of the statute take on the flesh of meaning only by case-by-case application of it to the multifarious shapes that transaction of business assumes." Fulghum Industries v. Walterboro Forest Products, Inc., 345 F.Supp. 296, 298 (S.D., Ga.) aff'd by the Fifth Circuit in 477 F.2d 910. I would not decide that case differently as to its Long-Arm feature in spite of the rulings in *Malouf* and *Wood-Mosaic*. In *Fulghum* it was held that mere visits to this State by officials of a foreign corporation, having no office or agency in Georgia, for the prupose of observing a manufacturing operation and conducting negotiations of a contract for fabrication of machinery in this State and construction of a mill in South Carolina did not constitute the transaction of business in Georgia under the statute.

The instant case stands quite differently. Here a resident of New Jersey entered into a contract of affreightment with one doing business in Georgia to deliver cargo by vessel at an agreed freight rate to Savannah. Pursuant thereto, the ship sub-chartered for the voyage by defendant put into that port and discharged granite shipped by plaintiff from Africa. This occurred in the course of the business in which Leonard J. Buck & Co. was engaged. I hold that such activity constituted the transaction of business in Georgia although it was the first and only time defendant had such a contact with this State.

The motions to dismiss for want of jurisdiction and to quash service are overruled.